UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUNIOR HUERTAS, | : | |
| PLAINTIFF, | : | |
| | : | CIVIL ACTION NO. |
| | : | 3:11-cv-00528 (VLB) |
| v. | : | |
| | : | |
| JAMES IVANKO and OMAR JIMENEZ, | : | |
| DEFENDANTS. | : | MARCH 25, 2013 |

MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [DKT. 22]

I.      Introduction

The Plaintiff, Junior Huertas ("Huertas"), brings this action against Defendant Bridgeport Police Officers James Ivanko ("Ivanko") and Omar Jimenez ("Jimenez") in their individual capacities stemming from an incident that resulted in Huertas's arrest.  Plaintiff alleges claims for: (1) Ivanko's and Jimenez's use of excessive force in violation of his Fourth Amendment rights pursuant to 42 U.S.C. § 1983; (2) violations of his First Amendment rights pursuant to 42 U.S.C. § 1983; (3) common law reckless infliction of emotional distress; (4) common law assault; (5) common law battery; and (6) common law invasion of privacy.  Currently pending before the Court is Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  The Defendants contend that their alleged use of excessive force was not unreasonable and that, even if it was, they are entitled to qualified immunity.  Additionally, the Defendants argue that the claims against Officer Jimenez must be dismissed as Plaintiff has neither alleged nor provided any evidence in the record that Officer Jimenez applied any

1

force against the Plaintiff during the incident in question.  For the reasons stated hereafter, the Defendants' Motion for Summary Judgment as to Plaintiff's federal claims is GRANTED.

## II.   <u>Factual Background</u>

The following facts relevant to the Defendant's Motion for Summary Judgment, taken in the light most favorable to the Plaintiff, are undisputed unless otherwise noted.

This case arises from an incident that took place on July 12, 2009 at approximately 8:45 pm between the Plaintiff and members of the Bridgeport Police Department.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 1].  On July 12, Junior Huertas attended a party at a friend's home at 358 Park Avenue[1] in Bridgeport, Connecticut, to watch the annual Puerto Rican Day Parade taking place along Park Avenue.  [*Id.* at ¶ 2].  Approximately thirty people attended the party and alcohol was provided for guests, including beer in cans and on tap.  [*Id.* at ¶ 17]. There was a DJ at the party named Fano who was playing music which was broadcast into the street by two speakers positioned facing the street, one in the left porch corner and one in the center (viewed from a position facing the home). [Dkt. 28-1, Huertas Depo. pp. 44, 69].  Mr. Huertas arrived with his fiancée at the party around 1:00 pm, when the parade was about halfway done, and consumed "like ten beers" between 1:00 pm and 8:45 pm, the time of the incident at issue in this case.  [Dkt. 24, Ds' 56(a) Stmnt. ¶¶ 16, 18; Dkt. 28-1, Huertas Depo. p. 38].

---

[1]     The parties variably report this address as 358 and 360 Park Avenue.  The Court will refer to the address as 358 Park Avenue for ease of reference.

Huertas and his fiancée had an understanding that she would drive the couple home that night because "she's the one that drives home . . . because she doesn't drink." [Dkt. 24, Ds' 56(a) Stmnt. at ¶ 18]. Between the time he arrived at the party and the time of the incident Huertas consumed at least 10 beers, including two beers less than an hour before the incident, and his fiancé consumed approximately 4 beers. [Dkt. 28-1, Huertas Depo. pp. 40, 44, 95-97].

Approximately fifteen to thirty minutes before the incident at issue, an unnamed Bridgeport police officer or officers walked through the gate in front of 358 Park Avenue to the front yard and told Fano to lower the volume of the music he was playing. [Dkt. 24, Ds' 56(a) Stmnt. ¶ 20; Dkt. 28-1, Huertas Depo. p. 44-45]. At the time the officers told the DJ to lower the volume, the DJ's music had drawn a crowd in the street; people had gathered outside of the home and, according to Huertas, they had "stay[ed] [after the conclusion of the parade] and they dance[d] in the street and dance[d] on the sidewalk." [Dkt. 24, Ds' 56(a) Stmnt. ¶¶ 21-22]. Mr. Huertas recounted that "there [were] more people than traffic" on the street as the music was "keeping them there," forming a sort of social area in the street. [*Id.* at ¶¶ 20, 22-23]. After the officers asked the DJ to lower the volume, the DJ complied, but screamed at the police in protest, prompting the people in the street to join in protest and his wife to caution him to calm down. [Dkt. 28-1, Huertas Depo. pp. 59-63]. Other residences along Park Avenue also lowered their music at the officers' direction and the officers continued to walk up the street, clearing the park area and telling the people gathered along Park Avenue to disperse. [Dkt. 24, Ds' 56(a) Stmnt. ¶¶ 23, 25; Dkt. 28-1, Huertas Depo. pp. 49-50].

3

The police proceeded down the street to the park.  [Dkt. 28-1, Huertas Depo. p. 64].

According to Huertas, after the officers left the yard of 358 Park Avenue, he and others at the party "were kind of upset because this never happened to us before then" and "it became a conversation that [the officers] were being unfair because actually the event [at 358 Park Avenue] wasn't even finished then," as in previous years the party was allowed to continue until around 9:00 pm.  [Dkt. 24, Ds' 56(a) Stmnt. ¶¶ 24, 25; Dkt. 28-1, Huertas Depo. p. 50].  Fano left the porch and walked across the street to the store after the officers asked him to lower the volume; he was not present later for the incident that prompted this lawsuit.  [Dkt. 28-1, Huertas Depo. p.64].

At approximately 8:45 pm, several officers from the Bridgeport Police Department were attempting to clear the northbound and southbound travel lanes and sidewalks of Park Avenue, including the sidewalk directly in front of 358 Park Avenue where a large crowd had gathered.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 3; Dkt. 23-1, Jimenez Incident Report].  These officers included Officer Alterio and Defendant Officers Jimenez and Ivanko.  [Dkt. 23-1, Jimenez Incident Report; Dkt. 23-3, Alterio Incident Report; Dkt. 23-4, Ivanko Use of Force Report].  According to a Use of Force Report prepared by Defendant Officer Ivanko, the larger crowd consisted of "approximately 2500 to 3000 individuals in the streets and blocking sidewalks northbound on Park Avenue."  [Dkt. 23-4, Ivanko Use of Force Report].

Mr. Huertas and the Defendant Officers disagree and Huertas' deposition testimony is inconsistent on the details of what then transpired.  Mr. Huertas, who was on the porch of 358 Park Avenue where the speakers – which were still broadcasting music – were located, alleges that no interactions or verbal exchanges took place between the officers clearing the crowd and any occupant of 358 Park and asserts that he did not hear the officers yell or say anything to anybody on the porch or on the premises of 358 Park Avenue.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 27; Dkt. 28-1, Huertas Depo. pp. 68-69].  Instead, Mr. Huertas alleges that three officers then entered the yard of the home and began arresting people without reason; "one of the officers just started pointing fingers [at people] like: You're going.  You're going."  [Dkt. 28-1, Huertas Depo. p. 55].  Huertas alleges that two police officers then came up on the porch with the intention of arresting Wilmer Garcia, who was also on the porch.[2]  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 29].  One of the officers pointed at Mr. Garcia and ordered: "come with me" and/or "you're under arrest."  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 32; Dkt. 28-1, Huertas Depo. pp. 70, 93].

The officers, on the other hand, allege the opposite.  Officer Alterio, in an Incident Report completed on July 12, reported that he "observed officer Jimenez walk over to the porch of 358 Park Ave and start to talk to a party later identified as Garcia, Wilmil . . . after O. Jimenez talked to him the party started to yell at the officer and said that 'you can't do shit'."  [Dkt. 23-3, Alterio Incident Report].

---

[2]     The Complaint alleges Mr. Garcia's first name to be Wilmer, as does Plaintiff's opposition to Defendants' motion for summary judgment. Defendants' motion for summary judgment and 56(a)(1) statement, as well as Officers Jimenez's and Alterio's Incident Reports, refer to him as Wilmil.  For ease of reference, the Court will refer to this individual as Mr. Garcia or Garcia.

Officer Jimenez reported in his own Incident Report that as he was attempting to clear the crowd "Garcia started to yell out, 'They can't do shit!  They can't do shit!  F*** you!'" at which point "the large crowd in front of and on the porch of 358 Park Ave. began to agree with Garcia and did not want to disperse."  [Dkt. 23-1, Jimenez Incident Report].  Jimenez reports that he "notified Garcia to stop talking" but Garcia "refused to keep quiet," so Jimenez ordered Mr. Garcia to step down from the porch.  [Dkt. 23-1, Jimenez Incident Report].

Huertas contends that he then approached and "intervened asking the officer, you know, what is the cause for the arrest? . . . [Garcia] was with me here.  He didn't do anything."  [Dkt. 24, Ds' 56(a) Stmnt. at ¶ 31; Dkt. 28-1, Huertas Depo. at pp. 70, 92].  Defendant Officer Jimenez reported that as he approached the steps of the house, Mr. Huertas stood in front of him with an alcoholic beverage in his hand and stated "You ain't touching him," at which point Jimenez advised Huertas to step aside.  [Dkt. 23-1, Jimenez Incident Report].  Officer Alterio reported that as Officer Jimenez walked up the stairs to arrest Mr. Garcia, Mr. Huertas "stood up and got in the face of officer O. Jimenez" and then began to argue with Officer Alterio as he approached in order to cover Officer Jimenez.  Alterio further reported that he then told Mr. Huertas to stop or he would be arrested, at which point Huertas walked back to where Officer Jimenez was standing and "caused a scene yelling and screaming 'you can't touch me in the yard it's private property' getting the crowd of approximately 40 to 50 people wound up."  [Dkt. 23-3, Alterio Incident Report].

At the time Huertas attempted to intervene, Mr. Garcia and the officers[3] were facing one another and Huertas was eight to ten inches from the officers, facing the officers and Garcia in profile.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 33].  Huertas admits that before he attempted to intervene he had had a beer in his hand, which he set down on a table immediately before questioning the officers.  [*Id.* at ¶ 33].  He also admits that he had consumed "like ten beers" between 1:00 pm and 8:45 pm, two of which he consumed between the time the officers first asked the DJ at 358 Park to turn down the music volume and the time of the incident.  [*Id.* at ¶¶ 18, 26].  In their respective police reports, Officers Alterio and Ivanko described Mr. Huertas as "intoxicated."  [Dkt. 23-3, Alterio Incident Report; Dkt. 23-4, Ivanko Use of Force Report].  Huertas, however, denies that he was inebriated.  [Dkt. 29, P's 56(a)(2) Stmnt. at Disputed Issues of Material Fact ¶ 1].  The following dialogue transpired at Huertas' deposition:

> Q [Counsel].  Can you say to me, sir, that you were sober at the moment in time you were talking with the police officer [attempting to arrest Mr. Garcia]?
>
> A [Huertas].  When I was talking to him, I was normal.
>
> Q.  I didn't ask you if you were normal.  I asked you: Were you sober?
>
> A.  Oh, to be honest, sober would have be [sic] having no beers.
>
> Q.  Right.  So you weren't sober when you were talking to the officer?

---

[3]      At deposition, Mr. Huertas and counsel examining him spoke both about an "officer" and two "officers" who approached the porch and proceeded to engage with Wilmer Garcia.  It is unclear from the testimony whether Mr. Huertas initially engaged with one or two officers on the porch.  As such, the Court leaves intact both the admitted facts in Defendants' 56(a)(1) statement and the quotes from Mr. Huertas' deposition testimony and allows them to speak for themselves.

A.  I wasn't drunk.

Q.  I didn't ask whether you were drunk.  I asked whether you were sober?

A.  I could say I was sober.

Q.  Your testimony is that after drinking ten beers, at least ten beers all day long from 1:00, at the time you talked to these officers you were sober?

A.  That was ten beers in a couple hours.  That didn't do nothing to me.

Q.  Okay.

A.  If I knew I was in a position where I couldn't talk to the officer, I wouldn't approach the officer.

[Dkt. 28-1, Huertas Depo. pp. 95-96].

The parties agree that the officer attempting to arrest Mr. Garcia – Officer Jimenez – told Huertas to step back and mind his own business or he would be arrested.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 34].  Mr. Huertas contends that Officer Jimenez slapped him and poked him in the chest as Jimenez was directing him to step back.  [Dkt. 28-1, Huertas Depo. at p. 97].  As a result, Huertas "stepped back to a certain point. . . . Like two feet," placing Mr. Huertas approximately two to three feet from the officer and Mr. Garcia.[4]  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 34; Dkt. 28-1, Huertas Depo. p. 98].  After he stepped back, Huertas continued to interfere, questioning the officers about why Mr. Garcia was being arrested and continuing to tell the officer arresting Mr. Garcia not to place Mr. Garcia under arrest.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 35; Dkt. 28-1, Huertas Depo. pp. 98-99].  In response, the officer arresting Mr. Garcia warned Huertas at least twice to step back and not get

---

[4]      Contradictorily, Mr. Huertas also testified that, after the officer told him to step back, that he "wasn't stepping back." [Dkt. 28-1, Huertas Depo. p. 70].

involved or he would be arrested.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 36; Dkt. 28-1, Huertas Depo. pp. 98-100].  Mr. Huertas did not step back any further and did not follow the officer's instruction to not get further involved; instead, he testified that "I didn't stop talking.  I kept on asking him why" even though the officer arresting Mr. Garcia "just kept on saying to step back" or Huertas would be arrested.  [Dkt. 24, Ds' 56(a) Stmnt. ¶¶ 37, 38].  As Mr. Garcia was being handcuffed, Huertas continued to tell the officers not to do so.  [*Id.* at ¶ 39].

Huertas recounts that by the third time the officer arresting Mr. Garcia told him to step back, "two cops came up on the porch and started pushing [Huertas] away" and told him that he was under arrest.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 40; Dkt. 28-1, Huertas Depo. p. 100].  Huertas, who did not want to be arrested or handcuffed, testified that when the officers then attempted to handcuff him, he resisted, demanding that the officers inform him of the reasons for his arrest and did not willingly tell the officers that they could cuff him.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 41; Dkt. 28-1, Huertas Depo. pp. 101-102].  According to Officer Jimenez's Incident Report, he was the officer responsible for taking Mr. Garcia into custody.  [Dkt. 23-1, Jimenez Incident Report].  His report also noted the presence of Officers Alterio and Ivanko on the porch, and further reported that "Huertas got into a physical altercation with the two assisting Officers."  [Dkt. 23-1, Jimenez Incident Report].  Further, Officer Alterio's Incident Report states that Alterio was the officer who then advised Huertas to "turn around and place his hands to his back as I was going to hand cuff him."  [Dkt. 23-3, Alterio Incident

Report].  Huertas denies that he became involved in a physical altercation with the officers.  [Dkt. 29, P's 56(a)(2) Stmnt. at ¶5].

Huertas testified that these two officers then put their hands on him and forcefully pushed him toward the porch column, which Huertas missed, causing him to push up against the railing and fall over it backwards.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 42; Dkt. 28-1, Huertas Depo. p. 104].  Mr. Huertas admitted that it was his understanding that the officers pushed him toward the column in order to separate him from the area where Mr. Garcia and the third officer were located so they could effectuate Mr. Huertas's arrest.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 43; Dkt. 28-1, Huertas Depo. pp. 101-102].  Additionally, he admitted that he did not want to go in the direction of the railing when pushed, and thus did not voluntarily take a step backwards toward the railing; Mr. Huertas admitted that the officers continued to have to push him toward the railing and that he was resisting their efforts to do so.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 45].  Huertas also concedes that although the officers pushed him in the direction of the porch railing, they did not literally push him over the porch railing, nor did they push him over the railing intentionally.  [*Id.* at ¶ 44].

Huertas contends that the officers "were not trying to stop [him] from falling" over the porch railing.  [Dkt. 28-1, Huertas Depo. p. 105].  However, Huertas admitted that he "felt bodies against [his] legs," felt force being exerted against his legs between the railing and a person or persons on the other side of the railing who were exerting the force, and testified that "I felt the bodies, felt like arms trying to grab me."  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 48; Dkt. 28-1, Huertas Depo.

pp. 109-110].  Huertas did not identify during deposition who exerted this pressure against his legs.  [Dkt. 28-1, Huertas Depo. p. 109].  This admission, though, comports with Officer Alterio's report, in which he stated that as Huertas was falling over the railing, he "tried to grab the suspect but (S1) fell off the porch, I was able to hold on to the suspect from the first floor porch approximately 6 feet off ground so he didn't hit the ground when he fell off the porch."  [Dkt. 23-3, Alterio Incident Report].  Officer Ivanko similarly reported that he "observed the suspect . . . being held by Officer Alterio in an effort to prevent him from falling off the porch."  [Dkt. 23-4, Ivanko Use of Force Report].

Further, Alterio reported that as he was holding Huertas from falling off the porch, "an unknown female came from behind me and started to punch me in the back.  At that point I let the suspect go, and he fell to the ground.  I turned to get the female party to stop hitting me . . ."  [Dkt. 23-3, Alterio Incident Report].  Ivanko similarly reported that "Officer Alterio appeared to have been hit in the back and let go of the suspect in front of my position," which resulted in Huertas being "let down easy" from the porch.  [Dkt. 23-4, Ivanko Use of Force Report].  Huertas testified that as he was going over the railing he observed his fiancée "coming up to the officer, behind the officer;" and that he "just saw her approaching behind the officers.  And then after that, that's when I fell."  [Dkt. 28-1, Huertas Depo. pp. 76, 79].  As he was falling backwards, Huertas states that he "grabbed somebody's shirt" with his right hand, but that the shirt "broke or something," and he "[j]ust felt like a button popped.  Something popped, had to

be a button."[5]  [*Id.* at pp. 71-73].  Officer Alterio noted in his report that "[d]uring

the struggle with the suspect [sic] grabbed my shirt pulling and ripping the

buttons off."  [Dkt. 23-3, Alterio Incident Report].

---

[5]     Plaintiff, in his Local Rule 56(a)(2) Statement [Dkt. 29], states that "Huertas did not grab the officers [sic] shirt, but felt a button pop off as he was failing [sic]." [Dkt. 29, P's 56(a) Stmnt. at ¶ 46].  This is not, however, an adequate reflection of Huertas' deposition testimony, which does not support this denial:

> Q: Well, when you went over, did you actually go over or were you held in place at some point?
> A: I went over completely.  I was trying to hold on to something, trying to grab something, because I already had all the weight falling.  All my weight was already going toward that pitch.  I was trying to grab on to something.  And that's when I grabbed somebody's shirt.  And I felt that the shirt - - I don't know - - broke or something, but it was too late.  I was already on the ground.
> Q: You mean the person's shirt that you grabbed was on the porch?
> A: Was on the porch, yes.
> Q: And when you went back, you felt the shirt give way?
> A: I grabbed on to somebody's shirt.  I wasn't looking at the time.
> Q: You mean you felt the shirt tear or the buttons tear or what did feel? [sic]
> A: I felt something just giving way, because only this hand grabbed, my right hand grabbed something.
> Q: Okay.  As you were going backwards, your right hand was grabbing an officer's shirt, because you felt the shirt give way when you went backwards over the railing?
> A: Over the railing.
> Q: Okay.  So prior to that moment of you going back over the railing, your hand was in the shirt enough to actually grab hold of it and for the shirt to give way as you fell backwards?
> A: I didn't really have a grab on it.  I think if I would have, I would have torn the shirt.  I let go at the time.
> Q: Okay.  But you just said you felt the shirt give way?
> A: Yeah, like something popping.
> Q: Okay.  Like buttons popping?
> A: Could have been a button.
> Q: All right.  Did you feel the shirt tear?
> A: No.
> Q: Or did you just feel buttons pop?
> A: Just felt like a button popped.  Something popped, had to be a button.

[Dkt. 28-1, Huertas Depo. at pp. 71-73].

After Huertas hit the ground, he alleges that he was able to rise to his feet before any officers arrived at his location.  [Dkt. 24, Ds' 56(a) Stmnt. ¶¶ 49, 50]. Thereafter, Huertas recounts that three officers who had been in the street came into the yard and were "getting their arms around" him.[6]  [Dkt. 28-1, Huertas Depo. pp. 111, 113].  At this point, Huertas testified, "all the neighbors came. They were surrounding the officers, surrounding the porch.  There was loud screaming and hollering."  [*Id.* at 111].  The interaction with the three officers lasted for approximately two minutes, during which time the officers kneed and elbowed Huertas in an attempt to make him go to the ground from his standing position.  [Dkt. 29, P's 56(a) Stmnt. ¶¶ 52, 53].  During this interaction the officers repeatedly told Huertas to get on the ground; Huertas, however, did not comply with this directive because, as he testified, "I feel they could have cuffed me where I was standing.  Why should I get on the ground?"  [*Id.* at ¶ 53].  As a consequence of this disagreement between the officers and Mr. Huertas, Huertas resisted the officers' efforts to put him on the ground to be handcuffed.  [Dkt. 28-1, Huertas Depo. p. 121].  He further relates that during the interaction he "was waving [his] arms . . . just trying to explain to them . . . Why this?  Why now? Why is this happening?"  [Dkt. 28-1, Huertas Depo. p. 114].  At one point during the interaction Huertas' arm came into contact with the mid-section of one of the officers.  Huertas testified that "I remember putting my arm out and, yeah, grabbing on to one of [the officers]. . . . Because they were pushing me so hard - - I just felt my arm.  I didn't really grab him."  [*Id.* at p. 114].  Huertas qualified this

---

[6]      Huertas does not identify these officers anywhere in the record.

statement with the further explanation that he did not grab the officer, but rather he exerted force with his left forearm on the "mid back" area of one of the officers, above the belt, because he was falling as a result of the officers pushing him.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 51; Dkt. 28-1, Huertas Depo. pp. 115-116].

While Huertas was resisting the officers' attempts to put him on the ground, he claims that Defendant Officer Ivanko jumped from the porch, over the railing and onto the ground, and struck Huertas in the face near his right eye. [Dkt. 28-1, Huertas Depo. pp. 75, 122-124; *see also* Dkt. 24, Ds' 56(a) Stmnt. ¶ 54; Dkt. 29, P's 56(a) Stmnt. ¶ 56].  Huertas concedes that at the point at which he felt the officer strike him in the face he was still refusing the officers' commands to go down to the ground.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 55].  After he was struck in the face, Huertas alleges that he was pushed against the building located approximately two feet away and then pushed to the ground, where the officers handcuffed him.  [Dkt. 28-1, Huertas Depo. pp. 124-125].

The officers' reports recount what transpired on the ground differently, including which officer interacted with Huertas on the ground and which leapt from the porch.  Officer Ivanko reported that, once Huertas had gotten to his feet, he "grabbed at me and put me in a head lock, I was able to reverse the position and place Huertas in a head lock while telling him to stop resisting stop fighting he continued to fight and would not stop and grabbed onto my belt and weapon." [Dkt. 23-4, Ivanko Use of Force Report].  Ivanko noted that there were other people "grabbing at me trying to pull me off" of Mr. Huertas, and that Ivanko was able to take Huertas to the ground with a front leg sweet "as he continued to fight

**14**

with me attempting to remove my weapon." [Dkt. 23-4, Ivanko Use of Force Report]. Ivanko further reported that he attempted to strike Huertas with his right fist as they "were still entangled" and was "able to land one strike to Huertas [sic] right shoulder facial area," at which point other officers came to Ivanko's assistance and subdued and handcuffed Huertas. [Dkt. 23-4, Ivanko Use of Force Report]. Officer Alterio, who remained on the porch immediately after Mr. Huertas fell from the railing, similarly observed Huertas "grab officer J. Ivanko who was off the porch grab him around the neck," at which point Alterio "let the female [who had been punching him from behind] go and jump off the porch railing to get the suspect off of officer J. Ivanko at this time other officers immediately ran over due to the line of officers being all in the same area." [Dkt. 23-3, Alterio Incident Report]. Alterio also reported that "[t]he suspect wouldn't let officer Ivanko go and I struck the suspect hitting him in the face to get the suspect off of officer J. Ivanko and to get control of him." [Dkt. 23-3, Alterio Incident Report]. Huertas denies hitting or grabbing any officer, and denies attempting to remove any officer's weapon. [Dkt. 29, P's 56(a) Stmnt. ¶¶ 10, 11].

Huertas sustained a right orbital floor fracture for which he underwent surgery on July 27, 2009, during which an anatomic titanium orbital floor plate was inserted and secured to Huertas' orbital rim. [Dkt. 28-3, Dr. Yan Operative Report]. Huertas alleges that he sustained this injury as a result of Defendant Ivanko's blow to his face. [Dkt. 29, P's 56(a) Stmnt. at ¶ 8]. Huertas also alleges that he sustained pinched nerves in his neck as a result of the fall from the porch, astigmatism in his right eye, and emotional repercussions, as well as facial and

body contusions, a subconjunctival hemorrhage, and a sprained shoulder.  [Dkt. 28-1, Huertas Depo. pp. 131, 139, 141; Dkt. 1, Compl. ¶ 25].

Mr. Huertas was charged with violations of Conn. Gen. Stat. § 53a-181, Breach of the peace in the second degree; Conn. Gen. Stat. § 53a-178, Inciting to riot; Conn. Gen. Stat. § 53a-167a, Interfering with an officer; and Conn. Gen. Stat. § 53a-167c, Assault of public safety personnel.  [Dkt. 23-3, Alterio Incident Report].  Huertas testified that the State entered a nolle as to these charges after he participated in an accelerated rehabilitation program, performed 200 hours of community service, made a $250 donation to charity, and completed two years of probation.  [Dkt. 28-1, Huertas Depo. p. 145].   Wilmer Garcia was likewise charged with Breach of peace and Inciting to riot.  [Dkt. 23-1, Jimenez Incident Report].

### III.   <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

IV.   <u>Discussion</u>

a.   <u>Retaliation in Violation of the First Amendment</u>

Plaintiff alleges that the Defendant Officers' intentions in arresting him were to prevent Plaintiff from speaking out about the officers' conduct in violation of the First Amendment as it related to the arrest of his friend, Mr. Garcia, and to his own seizure.  [Dkt. 1, Compl. ¶¶ 35-36].  The Defendants counter that probable cause to arrest Mr. Huertas existed and furthermore, Mr. Huertas has failed to raise a challenge to probable cause, thereby nullifying Plaintiff's First Amendment retaliation claim brought pursuant to 42 U.S.C. § 1983.  [Dkt. 23, Ds' MSJ p. 27].  The Court agrees with the Defendant Officers.  Probable cause existed to arrest Mr. Huertas; as such, his First Amendment retaliation claim must be dismissed.

To prevail on a First Amendment retaliation claim, "plaintiff must prove: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *see also Oglesby v. Eikszta*, No. 11–4349–cv, 2012 WL 4478772 (2d Cir. Sept. 28, 2012) (quoting same); *Marshall v. Town of Middlefield*, 3:10-CV-1009 (JCH), 2012 WL 601783 (D. Conn. Feb. 23, 2012) *recon. denied*, 3:10-CV-1009, 2012 WL 1118950 (D. Conn. Apr. 3, 2012) (quoting same).

Huertas has not satisfied the first prong of his First Amendment claim. Huertas contends that he was arrested in retaliation for asking the officers why they were arresting Mr. Garcia and, later, for repeatedly questioning his own arrest.  "[P]rovocative speech directed at police officers is protected against

**18**

censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."  *Anderson v. City of New York*, 817 F. Supp. 2d 77, 96 (E.D.N.Y. 2011) *recon. denied*, 06-CV-5363 KAM VVP, 2011 WL 5175600 (E.D.N.Y. Oct. 31, 2011).  "Pure, non-obscene speech is protected unless the words, by their very utterance, inflict injury or tend to evoke immediate violence or other breach of the peace."  *Smith v. Metro N. Commuter R.R.*, 98 CIV. 2528 RWS, 2000 WL 1449865 (S.D.N.Y. Sept. 29, 2000).

Huertas' conduct created a clear and present danger to the safety of the police and to the members of the public present in the vicinity of 358 Park Avenue.  He admits that after having consumed ten beers, two of which he consumed thirty minutes before the altercation, and while he was upset, he interposed himself between the police and Mr. Garcia, who an officer was attempting to arrest.  He admitted telling the officer not to arrest Garcia and demanding an explanation for the arrest.  Huertas was, by his own estimation, standing only eight to ten inches from the officer arresting Garcia and he refused to move when the officer asked him to do so twice.  After the third request, he stepped back to approximately two to three feet from the officer, which was within arms' length, and continued to intercede.  He further admitted that there was a large crowd of people on the scene: more people in the street than there were cars (such that the crowd restricted all traffic from passing) plus thirty people at the party who were angry about the fact that the officers had told the DJ to turn down the music and the crowd to disburse a half hour earlier.  He further

**19**

admitted that the crowd did not disburse and remained partying to the music being broadcast from the porch.  Considering the totality of the circumstances, Huertas' questions together with his actions in the presence of the disgruntled crowd of revelers are not protected speech under the First Amendment, nor are the questions Huertas claims he directed at the officers attempting to arrest him. Huertas' speech, coupled with his actions and refusals to comply with the officers' commands, posed an immediate risk of harm to the officers on the scene and to bystanders, in that his words and actions were likely to invoke violence in the crowd.  *See Anderson*, 817 F. Supp. 2d 77, *recon. denied*, 06-CV-5363 KAM VVP, 2011 WL 5175600 (finding that plaintiff had satisfied the first prong of his First Amendment claim where plaintiff repeatedly requested that police officers arrest hospital security guard for assault after altercation between plaintiff and guard and where plaintiff insisted security camera would validate his claim of assault, where police officers arrived on scene after altercation had ended and advised plaintiff to leave the hospital rather than requesting arrest, and where there appeared to be no present danger to police officers, guard, or hospital visitors); *Smith v. Metro N. Commuter R.R.*, 2000 WL 1449865 (on motion to dismiss, plaintiff satisfied first prong where he alleged that he was arrested for questioning why he was ejected from a MetroNorth train and where he had consumed only one beer that day, where he was not disorderly, and where he posed no immediate threat to the officers or others).

Even assuming Huertas' speech was protected, he has failed to satisfy the second element of his First Amendment claim.  "Specific proof of improper

motivation is required in order for plaintiff to survive summary judgment on a

First Amendment retaliation claim." *Curley*, 268 F.3d at 73 (citing *Blue v. Koren*,

72 F.3d 1075, 1082–83 (2d Cir. 1995)).  However, where probable cause to arrest

exists, "an inquiry into the underlying motive for the arrest need not be

undertaken." *Curley*, 268 F.3d at 73.  Probable cause to arrest exists where an

officer has "knowledge or reasonable trustworthy information sufficient to

warrant a person of reasonable caution in the belief that an offense has been

committed by the person to be arrested." *Panetta v. Crowley*, 460 F.3d 388, 395

(2d Cir. 2006) (internal quotation marks and citations omitted).  *See also Walczyk

v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) ("[F]ederal and Connecticut law are

identical in holding that probable cause to arrest exists when police officers have

'knowledge or reasonably trustworthy information of facts and circumstances

that are sufficient to warrant a person of reasonable caution in the belief that the

person to be arrested has committed or is committing a crime.") (quoting *Weyant

v. Okst*, 101 F. 3d 845, 852 (2d Cir. 1996)).  "Whether probable cause existed is a

question that may be resolved as a matter of law on a motion for summary

judgment if there is no dispute with regard to the pertinent events and knowledge

of the officer." *Weinstock v. Wilk*, 296 F. Supp. 2d 241, 256 (D. Conn. 2003) (citing

*Weyant*, 101 F.3d at 852).  Moreover, "a claim for false arrest turns only on

whether probable cause existed to arrest a defendant, and . . . it is not relevant

whether probable cause existed with respect to each individual charge, or,

indeed, any charge actually invoked by the arresting officer at the time of arrest."

*Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).  *See also Johnson v. Ford*, 496

F. Supp. 2d 209, 213 (D. Conn. 2007) (AWT) ("Because the existence of probable cause depends on the probability, rather than the certainty, that criminal activity has occurred, the validity of an arrest does not require an ultimate finding of guilt.").

"Probable cause is to be assessed on an objective basis." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citation omitted). "Other than the facts known to the arresting officer at the time of arrest, an officer's state of mind is irrelevant." *Id.* at 153. Thus, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.* (internal quotation marks omitted). The Second Circuit has explained that "probable cause is a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules . . . While probable cause requires more than a mere suspicion of wrongdoing, its focus is on probabilities, not hard certainties." *Walczyk*, 496 F.3d at 156 (internal quotation marks and citation omitted). "In assessing probabilities, a judicial officer must look to the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* In sum, probable cause "requires only such facts as make wrongdoing or the discovery of evidence thereof probable." *Id.* at 157.

Mr. Huertas was charged with violations of (1) Conn. Gen. Stat. § 53a-181, Breach of the peace in the second degree; (2) Conn. Gen. Stat. § 53a-178, Inciting to riot; (3) Conn. Gen. Stat. § 53a-167a, Interfering with an officer; and (4) Conn. Gen. Stat. § 53a-167c, Assault of public safety personnel.  Under Connecticut law

> [a] person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or such other person's property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public and hazardous or physically offensive condition by any act which such person is not licensed or privileged to do.

Conn. Gen. Stat. § 53a-181.  "A person is guilty of inciting to riot when he advocates, urges or organizes six or more persons to engage in tumultuous and violent conduct of a kind likely to cause public alarm."  Conn. Gen. Stat. § 53a-178.  "A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer, special policeman . . . , motor vehicle inspector . . . or firefighter in the performance of such peace officer's, special policeman's, motor vehicle inspector's or firefighter's duties."  Conn. Gen. Stat. § 53a-167a.  Finally, "[a] person is guilty of assault of public safety, emergency medical, public transit or health care personnel when, with intent to prevent a reasonably identifiable peace officer [et al.] . . . from performing his or her duties, and while such peace officer . . . is acting in the

23

performance of his or her duties, (1) such person causes physical injury to such peace officer . . ."  Conn. Gen. Stat. § 53a-167c.  The Court finds that probable cause for Huertas' arrest existed for at least one – if not more – of these violations based on the facts known to the officers at the time of Huertas' arrest.

The officers involved in Huertas' arrest were aware of the following relevant facts and observations at the time of the incident:  First, as detailed previously, Mr. Huertas repeatedly disobeyed commands from the officers arresting Mr. Garcia to step back and not involve himself in Mr. Garcia's arrest.  At the time the first command was given Mr. Huertas was a mere eight to ten inches from the officers.  He then stepped back only two to three feet, after which the officers continued to tell him to step back – a command that Huertas did not heed. Second, as two officers then attempted to arrest Huertas, Huertas physically resisted the officers' attempts to have him step back toward the porch railing in order to distance himself from Mr. Garcia and Garcia's arresting officer (Officer Jimenez).  As a result, the officers were forced to push Mr. Huertas toward the porch column, which he missed, causing him to fall backwards over the railing and off the porch.  Third, when he landed on the ground in the front yard of 358 Park Avenue, Mr. Huertas got to his feet and refused to follow the repeated commands of the officers who instructed him to get on the ground in order to be handcuffed.  Mr. Huertas also physically resisted the officers' attempts to place him on the ground.  He continued to question the officers about his own arrest throughout the incident in the yard, which lasted approximately two minutes. Fourth, this incident transpired in the midst of a larger crowd of 2500 to 3000

24

people who had attended the festivities attendant to the Puerto Rican Day Parade. This larger crowd consisted in part of a crowd of people who had gathered on the sidewalk and in the street in front of 358 Park Avenue and who were enjoying the party's music and using the space as a social area.  There were more people than traffic on Park Avenue and Bridgeport police officers had been ordered to disperse the crowds along the street in order to restore traffic flow.  Further, thirty people attended the party on the private premises of 358 Park Avenue and were agitated at the officers' commands to lower the volume of the music. Finally, two of the officers involved in the altercation with Mr. Huertas observed that he appeared to be intoxicated.  While Huertas denies that he was drunk, he admits that he had consumed two beers between the time that the officers first asked the party's DJ to lower the music volume and 8:45 pm, a space of fifteen to thirty minutes, and that he had consumed approximately ten beers in total between 1:00 and 8:45 pm.  The officers observed Huertas with a beer in his hand, which he contends he placed on a table before initially intervening in Mr. Garcia's arrest.  It is not unreasonable given these admissions and Mr. Huertas' proximity to the officers involved in this incident for the officers to have believed, at the least, that Mr. Huertas had been drinking.

The totality of the above circumstances – known to the officers involved in the incident at issue and even when taken in the light most favorable to the Plaintiff – are enough to warrant the reasonable conclusion that Mr. Huertas, when he attempted to intervene in Mr. Garcia's arrest and refused to step back more than approximately two feet despite repeated warnings to do so, was guilty

of obstructing or hindering Officer Jimenez (who was arresting Mr. Garcia) in the performance of his duties.  Further, because Huertas actively and physically resisted the commands of the officers to step back toward the railing and later to get on the ground after the officers instructed him that he was under arrest, all while within the area in which a crowd of potentially thousands of people had gathered, it was reasonable for the officers to believe that probable cause existed that Huertas was resisting their attempts to perform their duties – namely, to arrest Mr. Huertas – in violation of Conn. Gen. Stat. § 53a-167a.  *See, e.g.*, *State v. Peruta*, 24 Conn. App. 598, 599 (Conn. App. Ct. 1991) (upholding conviction of defendant pursuant to § 53a–167a where defendant refused to comply with officer's direct order to move further away from the scene of a fatal automobile accident); *Acevedo v. Sklarz*, 553 F. Supp. 2d 164, 168 (D. Conn. 2008) (noting that "Connecticut courts most frequently find illegal interference with a police officer where the officer makes a direct request, which the defendant refuses to comply with, and it is that refusal that hinders or impedes the course of the investigation of the defendant or the performance of the officer's duties"); *White v. Wortz*, 66 F. Supp. 2d 331, 334 (D. Conn. 1999) (finding probable cause to arrest pursuant to § 53a–167a where plaintiff "resisted the officers and struggled with them while they were in line of duty in handcuffing him"); *United States v. Crump*, 62 F. Supp. 2d 560, 567 (D. Conn. 1999) (finding probable cause to arrest pursuant to § 53a–167a where suspect resisted pat-down and struggled with officer); *Cruz v. Reilly*, CIV. 3:05-CV-1524(CFD), 2007 WL 2815151, at *4 (D. Conn. Sept. 26, 2007) (finding probable cause to arrest pursuant to § 53a–167a where suspect stood and raised

his arm to separate officers from individual who officers desired to question and where suspect repeatedly directed individual not to talk to police).  Moreover, passive resistance of the type that Huertas claims he offered may constitute a violation of Conn. Gen. Stat. § 53a-167a.  For instance, the district court in *Herpel v. Joyce*, CIV. B:89-669(JAC), 1992 WL 336765 (D. Conn. Sept. 30, 1992) explained that

> The plain meaning of these terms ['hindering' or 'obstructing' pursuant to Conn. Gen. Stat. §53a-167a] indicates that a person can violate this statute through passive resistance as well as through active obstruction.  For that reason, a person could interfere with the performance of an officer's duties merely by refusing to leave an area that the officer was attempting to seal off.   The refusal to leave constitutes an interference because it creates a distraction that draws the officer's attention away from his other duties at the scene.  This is particularly true where the officers at the scene are greatly outnumbered by onlookers, and evidence of the crime remains at the scene in the custody of the officers.

*Id.* at *5 (holding that probable cause to arrest an individual for interfering with an officer existed where "the plaintiff was asked three times to leave the crosswalk, and each time he declined to do so—insisting, instead, on engaging the officers in a discussion about his reasons for remaining there").  *See also State v. Silano*, CR020180647, 2003 WL 949856, at *1 (Conn. Super. Ct. Feb. 24, 2003) (holding that defendant "committed the crime of Interfering with an Officer when she offered passive resistance to being arrested i.e. sitting down and putting her hands behind her back," and where her actions thus "hindered and delayed the police in removing her from the premises and thereby caused the situation to escalate"). Here, where the officers were outnumbered by the angry crowd which they were

trying to disperse, by arresting one of the people ostensibly responsible for playing the music which was attracting them, Huertas' refusal to heed several commands to step away from the person being arrested constituted probable cause for Plaintiff's arrest on the charge of interfering with an officer.

In sum, where Plaintiff offers no challenge to the existence of probable cause for his arrest and where such probable cause existed, summary judgment must be granted in favor of Defendants on Plaintiff's First Amendment retaliation claim. *See Golodner v. City of New London*, 443 F. App'x 622, 624 (2d Cir. 2011) (upholding district court's dismissal of plaintiff's First Amendment claim where plaintiff's arrests were based on probable cause and holding that "the existence of probable cause is a complete defense to a claim of retaliatory arrest"); *Simmons v. Love*, 3-09-CV-1218 WWE, 2012 WL 113665 (D. Conn. Jan. 12, 2012) (dismissing First Amendment claim where plaintiff's arrest was supported by probable cause).

Although it is unnecessary to do so, the Court notes that the Plaintiff has also failed to satisfy the third prong of his First Amendment claim. A "plaintiff must show, with respect to the third element, that his First Amendment rights were 'actually chilled.'" *Curley*, 268 F.3d at 73. "[A]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). Here, Plaintiff has failed to provide any evidence in the record that his First Amendment rights were actually chilled. Contrarily, Huertas admitted at deposition that after his arrest he was placed into a police van with Mr. Garcia

**28**

and that the two spoke with one another about how they "had no idea how could this be happening" and about the physical actions of the police officers during their interaction with Mr. Huertas, which is "all [they] talked about until [they] got to the precinct."  [Dkt. 28-1, Huertas Depo. p. 127].  Huertas further concedes that when he arrived at the precinct the officers at the station asked him how he had sustained various injuries, to which Huertas replied that their fellow officers had caused the injuries.  [*Id.*].  Huertas admits that he did not know any of the officers to whom he spoke at the precinct.  Given Huertas' testimony and the lack of evidence in the record of an actual chilling effect (aside from the conclusory allegation in Plaintiff's complaint that his First Amendment rights were violated), the Court concludes that Huertas' First Amendment rights were not chilled and thus not violated.  Huertas concedes that he spoke about the circumstances surrounding his arrest with Mr. Garcia in the police van and with unknown officers at the precinct.  Given this apparent lack of reticence in speaking about the incident or the officers' conduct after his arrest, the Court cannot conclude that Mr. Huertas' First Amendment rights were actually chilled.

Accordingly, the Court GRANTS summary judgment in favor of Defendants as to Plaintiff's First Amendment claim.

### b. Excessive Force and Qualified Immunity

Plaintiff alleges that Defendant Officers Ivanko's and Jimenez's conduct in arresting him – including (1) the force used to push him toward the porch railing, allegedly causing him to fall off the porch backwards and (2) the

subsequent blow to the face applied to subdue and arrest him in the front yard of 358 Park – violated the Fourth Amendment's mandate against unreasonable searches and seizures.  The Defendant Officers seek dismissal on three grounds: first, that their alleged use of excessive force was not unreasonable; second, that, even if it was, they are entitled to qualified immunity; and third, that the claims against Officer Jimenez must be dismissed as Plaintiff has neither alleged nor provided any evidence in the record that Officer Jimenez applied force against the Plaintiff during the incident in question.

Claims that law enforcement officers have used excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006).  "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham*, 490 U.S. at 396.  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id*.  Accordingly, a court must examine "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id*. (internal quotation marks and citations omitted).  The

reasonableness of a particular use of force must be judged objectively under the totality of the circumstances and "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*; *see also Jones*, 465 F.3d at 61 ("We are, of course, mindful that the reasonableness inquiry does not allow us to substitute our own viewpoint; we must judge the officer's actions from the perspective of a reasonable officer on the scene").  Furthermore, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Id.* at 396 (internal quotation marks and citations omitted).

It is well established that "[t]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted); *Tracy v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010) (holding same).  "Accordingly, when a defendant official invokes qualified immunity as a defense in order to support a motion for summary judgment, a court must consider two questions: (1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly

established at the time of the alleged violation." *Tracy*, 623 F.3d at 96.  Put another way, "[a] police officer performing a discretionary function enjoys qualified immunity from an excessive force claim unless (1) she 'violated a constitutional right' (2) that was 'clearly established' at the time of the alleged violation."  *Hodge v. City of Long Beach*, 425 F. App'x 33, 34 (2d Cir. 2011) (internal quotation marks and citations omitted).  It is within the sound discretion of a federal court to analyze the two qualified immunity factors in the order of its choosing, in light of the circumstances of the case at hand.  *Pearson*, 555 U.S. at 236.

As to the "clearly established" prong of this analysis, "[t]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (overturned on other grounds) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The right to be free from the use of excessive force under the Fourth Amendment is clearly established.  *Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2000); *Carey v. Maloney*, 480 F. Supp. 2d 548, 556 (D. Conn. 2007).  Thus, the issue is whether it was objectively reasonable for the officers to believe that their particular actions did not violate Plaintiff's right to be free from the excessive use of force.  Further, "the objective reasonableness test is met – and the defendant is entitled to immunity – if officers of reasonable competence could disagree on the legality of the defendant's actions."  *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995)

(internal quotation marks and citation omitted); *Crowell v. Kirkpatrick*, 400 F. App'x 592, 594 (2d Cir. 2010) ("even if the right at issue was clearly established in certain respects, ... an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context."). Accordingly, "the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." *Lennon*, 66 F.3d at 425.

### i.  Excessive Force as to Officer Jimenez

Defendants argue that the excessive force claim against Defendant Officer Jimenez must fail because Plaintiff has proffered no facts on the record that Officer Jimenez applied any force against Plaintiff in effectuating his arrest. The Plaintiff has neither directly addressed the validity of this argument in his opposition nor withdrawn this claim, thus requiring the court to address the claim.

The Court agrees that the claims against Jimenez must fail because the record indicates that Defendant Jimenez did not apply the force complained of against the Plaintiff. Plaintiff's complaint alleges that Officer Jimenez entered the porch of 358 Park Avenue, where "the defendants" arrested Wilmer Garcia. [Dkt. 1, Compl. ¶¶16-17]. The complaint further alleges that Huertas inquired why Garcia was being arrested, to which "Jimenez then aggressively responded that the plaintiff was also being arrested, and then grabbed the plaintiff by the shirt

while he was on the porch. . . . and then Defendant Jimenez pushed the plaintiff off the porch."  [*Id.* at ¶¶16-17].   No evidence in the record provided to the Court, however, supports the contention that Jimenez pushed Huertas off the porch.  At his deposition, Mr. Huertas testified that, after the third time Officer Jimenez – who was arresting Mr. Garcia – told Huertas to step back, "two cops came up on the porch and started pushing [Huertas] away" and told him that he was under arrest.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 40; Dkt. 28-1, Huertas Depo. p. 100].  Huertas further testified that these two officers then put their hands on him and forcefully pushed him toward the porch column, which Huertas missed, causing him to push up against the railing and fall over it backwards.  [Dkt. 24, Ds' 56(a) Stmnt. ¶ 42; Dkt. 28-1, Huertas Depo. p. 104].  Thus, Huertas has expressly denied Officer Jimenez's physical involvement in his fall from the porch.  Similarly, Officer Jimenez noted in his Incident Report that he was the officer responsible for placing Mr. Garcia into custody and further noted the presence of Officers Alterio and Ivanko on the porch, reporting that "Huertas got into a physical altercation with the two assisting Officers."  [Dkt. 23-1, Jimenez Incident Report].  Further, Officer Alterio, who is not a defendant in this action, corroborated that he was the officer who attempted to keep Mr. Huertas from falling off the porch.  [Dkt. 23-3, Alterio Incident Report].  Lastly, nothing in the record indicates that Officer Jimenez was involved with subduing Mr. Huertas in the front yard of 358 Park Avenue after he had fallen from the porch.

As noted, "[a] party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements,

**34**

or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.*, No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted).  Here, Mr. Huertas relies only on the conclusory allegations in his complaint that Officer Jimenez pushed him off the porch but has failed to substantiate this claim with even a scintilla of evidence in the record that would allow the Court or a jury to conclude that this allegation is true.  In fact, Mr. Huertas' deposition testimony expressly conflicts with the allegation of excessive force against Officer Jimenez.  As there is no evidence in the record upon which a jury could properly find in favor of Plaintiff – who has the burden to present such evidence – summary judgment is proper.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

Furthermore, although Plaintiff has argued in his opposition to the Defendants' motion for summary judgment that the force that propelled him over the porch railing was excessive, he has failed to address the argument that nothing ties Officer Jimenez to this use of force.  Thus, this claim has been abandoned and may be dismissed.  *See Coltin v. Corp. for Justice Mgmt., Inc.*, 542 F. Supp. 2d 197, 206 (D. Conn. 2008) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.")

(internal quotation marks and citation omitted); *Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296, 305 (D. Conn. 2009) (same).

The Court, therefore, GRANTS summary judgment in favor of Defendant Jimenez as to Plaintiff's allegation of excessive force.  This count is thus dismissed as to Defendant Jimenez.  *See also Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case"); *Kern v. Heimerdinger*, 3:09-CV-1000 PCD, 2010 WL 5069883 (D. Conn. Dec. 6, 2010) (citing *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) ("A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must designate specific facts showing that there is a genuine issue for trial.")).

### ii.  Excessive Force as to Officer Ivanko

The Plaintiff alleges that genuine issues of material fact preclude summary judgment on Plaintiff's excessive force claim, in that Plaintiff alleges and Defendants dispute that (1) Mr. Huertas was not intoxicated; (2) Huertas did not provoke or physically confront the officers; (3) Huertas did not resist arrest; (4) Huertas did not grab, punch, push or place in a headlock any of the officers during the interaction on the ground in the front yard; and (5) Huertas did not reach for any officer's weapon.  [Dkt. 29, P's 56(a)(2) Stmnt. ¶11; Disputed Issues

36

of Material Fact ¶¶1-3, 5-7].  The Defendants argue that the officers' use of force was reasonable and justified in light of the circumstances and that, even if it was not, the Defendant Officers are entitled to qualified immunity.  The Court agrees with the Defendant Officers and concludes that Officer Ivanko is entitled to qualified immunity.

Here, the Defendants were detailed to work the Puerto Rican Day Parade, which had drawn a large crowd and which the officers had been ordered to disperse in order to restore traffic along Park Avenue to normal.  At the time of the incident, Officer Ivanko noted in his report that the crowd consisted of "approximately 2500 to 3000 individuals in the streets blocking sidewalks northbound on Park Avenue."  In addition to the thirty people who attended the party at 358 Park Avenue, the music played by the party's DJ – which emanated from two speakers on the porch and projected toward the street – had drawn a large crowd in the street in front of the residence.  Huertas testified that the crowd "stay[ed] [after the conclusion of the parade] and they dance[d] in the street and dance[d] on the sidewalk" and that "there [were] more people than traffic" on the street as the music was "keeping them there."   He further testified that there were more people than cars in front of the home at that time and that it would have been difficult if not impossible for cars to drive on that portion of Park Avenue due to the crowd.  [Dkt. 28-1, Huertas depo. pp. 47, 57].  Huertas also testified that Fano, the person playing the music when the police stopped at the house the first time, yelled at the police complaining about being told to lower the volume of the music.

Huertas contends the officers who instructed Fano to turn down the music returned to 358 Park a half hour after instructing Fano to turn down the music, found the crowd still assembled in front of the house, walked up the steps and onto the porch to arrest Mr. Garcia.  He further testified that Mr. Garcia had left the porch moments before, but that he did not know where he went or what he did.  [Dkt. 28-1, Huertas Depo. pp. 89-91].  He testified that the police came on the porch and began to arrest Mr. Garcia for no reason and that no verbal interactions took place between the officers and the party's attendees.

Contrarily, the officers contend that Mr. Garcia hurled expletives in their direction and yelled that they could do nothing to disperse the crowd, which resulted in the crowd beginning to agree with Mr. Garcia and not wanting to disperse.

Regardless of whether any interaction took place between Mr. Garcia or any other party attendee and the officers attempting to clear the streets, there is no dispute that Mr. Huertas then attempted to intervene in Mr. Garcia's arrest.  Huertas admits that he was physically only eight to ten inches from the officers confronting Mr. Garcia at the time he attempted to intervene.  He also concedes that the officer attempting to arrest Mr. Garcia – Officer Jimenez – told him at least three times to step back or he would be arrested.  Huertas complied with Jimenez's second entreaty by backing up two to three feet, which the Court notes is roughly an arm's length, but did not comply with the officer's further demands to step back.  In addition, Huertas admits that he continued to verbally challenge the officer throughout, demanding to know why he was arresting Mr. Garcia and insisting that Mr. Garcia had done nothing to warrant an arrest.  After stepping

back two to three feet, Huertas still continued to question Jimenez and direct him not to arrest Mr. Garcia.  Jimenez continued to advise Mr. Huertas to step back and not get involved or he would be arrested as well.

By the third time Officer Jimenez told Huertas to step back and not involve himself, Huertas admits that two officers approached him and told him that he was under arrest.  Huertas questioned these two officers about the reasons for his arrest and, as they attempted to handcuff him, did not give his consent for them to do so.  According to Huertas, the officers then pushed him toward the porch column in order to separate him from the area where Officer Jimenez was arresting Mr. Garcia.  Huertas, who did not want to move in that direction, contends that he did not physically resist arrest, but contrarily testified that he did not voluntarily take a step backwards toward the railing; instead, he admitted that the officers continued to have to physically push him toward the railing at the same time that he was resisting their efforts to do so.  Huertas missed the porch column and was pushed instead against the porch railing, where he felt someone exerting pressure on his legs so that he would not fall over the railing.  Officer Alterio's Incident Report states that he held Huertas from falling over until an unknown female approached him from behind and began to punch him in the back, forcing Alterio to let go of Huertas.  Huertas admits that he saw his fiancée approach the officers from behind but did not see what she did because he fell immediately thereafter.  [Dkt. 28-1, Huertas Depo. pp. 76, 79].

After Huertas landed in the front yard of 358 Park, he rose to his feet.  Again, despite contending that he did not resist the officers' attempts to arrest

him, Huertas concedes that he did not comply with the officers' directives for him to get on the ground and resisted their physical efforts because, as he testified, "I feel they could have cuffed me where I was standing.  Why should I get on the ground?"  The interaction with the officers in the yard lasted approximately two minutes, during which time the officers repeatedly told him to get on the ground and kneed and elbowed Huertas in an attempt to make him go to the ground from a standing position.  Huertas admits that, at one point during the interaction, his left arm came into contact with the mid-back region of one of the officers, just above his belt, and at which point he exerted pressure on the officer.  In either event, Huertas admits that after falling off the porch he continued to refuse to comply with the officers' directives and both physically and verbally impeded their attempts to subdue him.

Huertas alleges that as he was resisting the officers' attempts to force him to the ground, Officer Ivanko leapt from the porch and struck him near his right eye, causing the injuries of which he complains.  Huertas was still standing at the time he was struck in the face.  Contrarily, Officer Ivanko alleges that he was on the ground before this punch was thrown and that Huertas was actively engaging him and had put him in a headlock, which he was able to reverse.  Ivanko alleges that Huertas was attempting to remove his service weapon and that he struck Mr. Huertas in his right shoulder facial area while the two were still entangled.  Officer Alterio, who is not a defendant in this action, reported that it was he who jumped from the porch and struck Huertas in the face in order to make Huertas let go of Officer Ivanko.

The force used by an officer against a suspect who is attempting to resist arrest, threatening, or assaulting an officer "must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000). Based on the totality of the circumstances, it was objectively reasonable for the officers on the porch (one of whom may have been Ivanko) to believe that pushing Mr. Huertas toward the porch railing did not violate Mr. Huertas' right to be free from the use of excessive force. Likewise, it was objectively reasonable for Officer Ivanko to believe that striking Mr. Huertas in the face area during a physical confrontation in which Mr. Huertas was resisting arrest did not violate Mr. Huertas' rights. This is particularly true under the circumstances present here, where the police were substantially outnumbered by a disgruntled crowd sympathetic to the expressed interests of the person being arrested, as the crowd wanted the music to continue. Thus, the officers have committed no constitutional violation and are entitled to qualified immunity.

The record plainly indicates that, while he was barely an arm's length from the officers on the porch, Mr. Huertas repeatedly ignored the officers' commands to step back further and not involve himself in Mr. Garcia's arrest, even despite the officers' warnings that Huertas himself would be arrested if he did not comply. In response to Huertas' repeated noncompliance, the officers (including Officer Alterio and possibly Officer Ivanko)[7] attempted to arrest Huertas, who

---

[7]     The Court notes that although Huertas alleges that one or two officers were on the porch effecting the arrest of Mr. Garcia and that two other officers stepped onto the porch to arrest Huertas, he failed to identify any of these officers at his

then actively resisted their efforts to physically distance him from Mr. Garcia,

forcing the officers to continually push him in the direction of the porch railing.

Even if the force used to push Huertas in the direction of the railing caused

Huertas to fall over the railing, Huertas' active refusal to move in the direction

ordered by the officers led to the officers' need to physically coerce him to move.

In order to force Mr. Huertas to comply with their directive to move away from Mr.

Garcia, the amount of force used by the officers *needed* to exceed the

countervailing force exerted by the defendant.  In the face of a suspect resisting

arrest and physically resisting the officers' entreaties to step back, it is not

unreasonable for the officers on the porch to have believed that pushing Huertas

---

deposition.  Based on the record, the Court may infer that Officers Alterio and Jimenez were present on the porch; Officer Jimenez was Mr. Garcia's arresting officer and Officer Alterio admits that he attempted to arrest Mr. Huertas on the porch and subsequently attempted to hold Huertas from falling over the porch railing.  Officer Alterio (who is not a defendant in this action) noted that Officer Ivanko was on the porch as an assisting officer, although Officer Ivanko's Use of Force Report does not necessarily place him on the porch.  Ivanko and Alterio both reported that Huertas engaged Ivanko on the ground once Huertas had fallen from the porch.  Further, Officer Alterio reported that he was the officer who jumped from the porch and struck Mr. Huertas in the face, although Huertas contends that Ivanko jumped from the porch and struck him.  Although Huertas' account of which officer jumped from the porch and struck him in the face differs from the accounts of the officers, the Court – as noted previously – finds it unnecessary to untangle the specifics of which officer jumped from the porch and threw the suspect punch.  Because the Court finds that this force was objectively reasonable, and because even if it were not the officer who threw it would be entitled to qualified immunity, and lastly because Officer Ivanko has admitted striking Huertas in the face while he was engaged with Huertas on the ground, the Court finds it unnecessary to delve further into the identity of the officer who jumped from the porch and struck Huertas.  As Defendant Officer Ivanko is the only remaining defendant in this action, the only uses of force at issue in this action are (1) the force allegedly used by Ivanko in pushing Huertas toward the railing of the porch, and (2) the punch thrown by Officer Ivanko (regardless of whether Ivanko jumped off the porch in order to deliver the blow).

in the direction of the railing was necessary to overcome Huertas' resistance and to effectuate his arrest.

Furthermore, the officers' actions speak to a level of urgency that precludes a finding for the Plaintiff.  Officer Jimenez was engaged in effectuating the arrest of Mr. Garcia on the porch of a private residence at which a party with thirty attendees was in effect and at which music was playing from two speakers placed on the porch.  The party was in a neighborhood awash in 2500 to 3000 people, many of whom were milling about in the street or on the sidewalks, and a large crowd of whom were directly in front of 358 Park Avenue and were impeding traffic.  The potential danger inherent in such a large crowd would have militated against a lazy approach to apprehending Mr. Garcia and, later, Mr. Huertas.  To quickly and effectively arrest Mr. Garcia such that the officers would not draw the attention or ire of any hostile elements in such a large crowd, Mr. Huertas – who was challenging the officers' actions and openly resisting their commands to step back – needed to be distanced from Mr. Garcia's immediate area.  While "[p]ushes and shoves, like other police conduct, must be judged under the Fourth Amendment standard of reasonableness," courts in this circuit have held that pushing a suspect in order to effectuate an arrest does not necessarily constitute excessive force.  *Saucier*, 533 U.S. at 209 (affirming grant of qualified immunity where officer shoved into police van a suspect who approached vice president in order to protest, and where officer did not know the extent of threat posed nor number of individuals potentially involved in threat); *Massaro v. Town of Trumbull*, 525 F. Supp. 2d 302, 308 (D. Conn. 2007) *aff'd sub nom. Massaro v.*

*Jones*, 323 F. App'x 68 (2d Cir. 2009) (granting qualified immunity to officer where, although the officer "may not have needed to push [the suspect] to the ground in order to arrest him, [the officer] was faced with a tense and uncertain situation involving a convicted felon and had to make a split-second decision"); *Elufe v. Aylward*, 09-CV-458 KAM LB, 2011 WL 477685 (E.D.N.Y. Feb. 4, 2011) (granting qualified immunity to defendant officers who shoved suspect against window where suspect admitted he was kicking his feet during arrest and where suspect had run from scene of crime with knife).

It was thus reasonable for the officers to believe that pushing Mr. Huertas away from Officer Jimenez and Mr. Garcia while Mr. Huertas was actively protesting Mr. Garcia's arrest and refusing to move away from him and the officer as directed did not constitute a violation of Mr. Huertas' rights.  Although it is doubtful that Huertas has shown that Officer Ivanko used excessive force in attempting to arrest him on the porch, even if the push toward the railing were excessive, such push did not violate a clearly established right such that a reasonable officer would have known that this conduct violated Huertas' Fourth Amendment rights.  Defendant Ivanko is entitled to qualified immunity on Plaintiff's charge that he used excessive force in pushing the Plaintiff while on the porch.

The Court likewise holds that Officer Ivanko is entitled to qualified immunity with respect to the blow he struck to plaintiff's facial/shoulder area.[8]

---

[8]     While Huertas contends that he was elbowed and kneed during the interaction with officers, he has only attributed the strike to his face to Officer

After falling from the porch, Huertas rose to his feet and for two minutes actively physically resisted several unnamed officers' attempts to put him on the ground despite their repeated commands for Huertas to get down from a standing position.  Huertas alleges that the officers were only able to bring him to the ground after Officer Ivanko struck him in the face, where the officers then handcuffed him and completed his arrest.  Furthermore, as described previously, the yard incident occurred in the midst of a larger crowd of between 2500 and 3000 people on Park Avenue which the officers were attempting to clear, approximately 30 of whom were on the porch where the Defendant Officer were attempting to arrest Mr. Garcia, and another large crowd of whom were on the sidewalk and in the street adjacent to the front yard of that residence.  Additionally, Huertas testified that the home's neighbors "were surrounding the officers, surrounding the porch" during the altercation, and "there was loud screaming and hollering."  [Dkt. 28-1, Huertas Depo. p. 111].

   In addition, the Court  notes that although Huertas contends that he was not intoxicated, he admits that alcohol was provided for the guests at the party, that he had consumed ten beers between 1:00 pm and 8:45 pm, that he had consumed two of those beers in the time between when the party's DJ turned the music down and when the Bridgeport police officers entered the yard of 358 Park the second time (a span the parties concede was only about fifteen to thirty minutes), that he had put his alcoholic beverage down on a table immediately

Ivanko, who is the only defendant with claims remaining in this action.  Because Huertas does not contend that Ivanko caused any further physical injury, this Court will only consider Officer Ivanko's strike to Huertas' facial/shoulder area in analyzing Huertas' claim of excessive force dealt to him while in the yard.

before he intervened in Mr. Garcia's arrest, and that he and his fiancée had an agreement that she would drive the couple home in anticipation of Mr. Huertas drinking more than would she.  Coupled with Huertas' admission that he was initially only eight to ten inches from the officers on the porch while he was attempting to intervene in Mr. Garcia's arrest, plus Huertas' necessary proximity to the officers in the yard, it was reasonable for the officers at the scene to believe that Mr. Huertas was intoxicated or, at least, not sober.

As with the push used against a resisting Mr. Huertas on the porch, Ivanko's blow to the Plaintiff's facial/shoulder area was not unreasonable given that (1) Huertas rose to his feet and actively resisted going to the ground despite the officers' commands to do so because he felt the officers could have handcuffed him standing up,[9] thus making it difficult if not dangerous to handcuff him; (2) there was a large crowd in the immediate vicinity of 358 Park Avenue, increasing the officers' urgency and the potential for danger to either Huertas, the officers, or the public; (3) Huertas immediately prior had physically resisted the officers' commands on the porch; (4) Officer Ivanko claimed that Huertas was actively reaching for Ivanko's service weapon; and (5) Huertas admitted that during the altercation his left forearm exerted pressure on an officer's mid-back area, near the belt.  Ivanko's single strike to Huertas' facial/shoulder area, which was the catalyst that forced Huertas to the ground and terminated the altercation, was thus reasonable based on the circumstances confronting Officer Ivanko at

---

[9]     The Court notes that "[a] person being placed under arrest has no right to prescribe the conditions under which he will comply with an officer's orders [.]" *Crowell,* 667 F. Supp. 2d at 410, *aff'd,* 400 F. App'x 592 (2d Cir. 2010) (internal quotation mark and citations omitted).

the time and in light of the force necessary to bring him to the ground.  *See, e.g., Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 129 (2d Cir. 2009) ("One punch causing no injury to a suspect who is resisting being put in handcuffs does not rise to the level of excessive force."); *Rafter v. Bank of Am.*, 04 CIV. 3341 JSRKNF, 2009 WL 691929 (S.D.N.Y. Mar. 12, 2009) (concluding that it was not objectively reasonable for officer effecting arrest of non-threatening bank customer who neither attempted to flee nor actively resisted arrest to strike the arrestee about the head; but *also* granting qualified immunity to officer); *Jaffe v. Fitzgerald*, CV-06-0317 DGT/WDW, 2009 WL 804740 (E.D.N.Y. Mar. 27, 2009) (granting qualified immunity to officers who physically tripped suspect in order to bring her to the ground where suspect physically resisted officers, was attempting to disobey a court order instructing her that she could not have contact with her son, and was acting in a disruptive manner).  *See also Massaro*, 525 F. Supp. 2d 302, *supra*, and *Elufe*, 2011 WL 477685, *supra*.

The Court therefore finds that Officer Ivanko is entitled to qualified immunity.  Because Mr. Huertas actively and physically resisted arrest, the Bridgeport police officers involved in this incident made the determination that they needed to use force to subdue and seize Mr. Huertas.  Given the sheer volume of the crowd of people gathered on Park Avenue and the potential for the crowd to turn against the police officers, who were outnumbered, posing a danger to the officers and to the public, it was not objectively unreasonable for Defendant Ivanko to conclude given the totality of the circumstances that striking Mr. Huertas in the face did not violate Mr. Huertas' Fourth Amendment rights.  At

**47**

the very least, officers of reasonable competence could disagree on the legality of Officer Ivanko's actions under these circumstances.

Furthermore, "claims that an officer made a reasonable mistake of fact that justified the use of force are considered" at the qualified immunity stage of an excessive force analysis.  "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotation marks and citations omitted).  Here, Officer Ivanko reported that Huertas physically interacted with him in the front yard of 358 Park after Huertas had fallen off the porch.  Although Huertas denies doing so, Ivanko reported that that Huertas had put him in a headlock and, while the two were entangled, was attempting to remove Ivanko's service weapon. Ivanko struck Huertas in the in the right shoulder facial area before other officers came to his assistance, where Huertas was then subdued and handcuffed. Huertas denies reaching for Officer Ivanko's service weapon but admits that he exerted force with his left forearm on the "mid back" area of one of the officers, above the belt.  He testified "I remember putting my arm out and, yeah, grabbing on to one of [the officers in the mid-back region]. . . . Because they were pushing me so hard - - I just felt my arm.  I didn't really grab him."

Given Huertas' admission that his forearm came into contact with the belt area of the officer with whom he was engaged on the ground, the Court concludes that it was a reasonable mistake of fact, given the circumstances and the observations of the Defendant Officer during this incident (enumerated

above), for Officer Ivanko to conclude that Mr. Huertas was attempting to remove his service revolver.  Accordingly, reasonable officers would also agree that Huertas – if he had indeed gained possession of Ivanko's service weapon – would have posed an immediate danger to himself, to the officers on the ground, to the party-goers, and to the larger crowd of people gathered around the residence.  In fact, a reasonable officer could have concluded that Mr. Huertas, if in fact he was attempting to remove an officer's service weapon based upon the location of Huertas' forearm on the officer's belt area, posed an immediate threat of death or serious bodily injury to the officer or to others in the nearby crowd, thus meriting the use of deadly force, especially if the officer had reason to velieve the person was intoxicated and thus had reduced inhibitions.  *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) ("an officer's decision to use deadly force is objectively reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others").  Thus, given the foregoing circumstances and the officer's reasonable beliefs, Defendant Ivanko's decision to strike Huertas in the face was at best objectively reasonable and at worst a reasonable mistake of fact nonetheless entitling Ivanko to qualified immunity.  *See, e.g., Greenwald v. Rocky Hill*, No. 3:09cv211(VLB), 2011 WL 4915165 (D. Conn. Oct. 17, 2011) (officers were entitled to qualified immunity where their belief that suspect was aiming shotgun at them was a reasonable mistake of fact); *Cowan*, 352 F.3d at 761 (qualified immunity analysis acknowledges that "reasonable mistakes can be made as to the legal constraints on particular police conduct" and "ensures that all but the

plainly incompetent or those who knowingly violate the law are protected from suit").

The Court GRANTS summary judgment in favor of Defendant Ivanko on Plaintiff's excessive force claim.

### c. State Law Claims for Reckless Infliction of Emotional Distress, Assault, Battery, and Invasion of Privacy

Having granted summary judgment as to the federal law claims against the Defendants, the Court declines to exercise its supplemental jurisdiction over the Plaintiff's state law claims.  "Supplemental or pendent jurisdiction is a matter of discretion, not of right.  Thus, the court need not exercise supplemental jurisdiction in every case."  *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 165-66 (D. Conn. 2005) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 715-26 (1966)). "The federal court should exercise supplemental jurisdiction and hear a state claim when doing so would promote judicial economy, convenience and fairness to the litigants.  The court should decline to exercise supplemental jurisdiction, however, when state law issues would predominate the litigation or the federal court would be required to interpret state law in the absence of state precedent. In addition, the court may decline to exercise supplemental jurisdiction where the court has dismissed all claims over which it has original jurisdiction."  *Id.* (citing 28 U.S.C. § 1367(c)(3)); *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction

doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims").

Because this Court has granted summary judgment for Defendants Ivanko and Jimenez on Plaintiff's 42 U.S.C. § 1983 claims, over which it has original jurisdiction, this Court declines to exercise supplemental jurisdiction over Huertas' remaining claims, all of which are state law claims. *See Zito v. Fried, Frank, Harris, Shriver & Jacobson LLP*, 09 CIV. 9662, 2012 WL 2333303 (S.D.N.Y. June 19, 2012) (citing *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d. Cir.1994) ("Under 28 U.S.C. 1367(a)(c), a Court has the discretion to exercise supplemental jurisdiction over pendent state law claims.  If, however, 'the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.'")).

## V.     Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's federal law claims.  The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  The Clerk is directed to close this file.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 25, 2013